## Jessup *versus* Smuck.

A testator having devised to his son Samuel, and to his heirs and assigns, the residue of a tract of land, he or they paying thereout and therefor to one of his daughters £50, in *one* and *two* years after his decease, and to his son Joel £50, in *four* years after his decease, and to another daughter £80, *one* year after his decease, or at his option to give them land worth the money devised to them, and to a grandson £10, to be paid *six* years after his decease, "and in case my son Samuel should die before he marries, then all that part of my estate which I have devised to him, in that case I give and devise to my son Joel Willis, his heirs and assigns, to have and to hold to him my said son Joel, his heirs and assigns for ever, in as full and ample a manner as my son Samuel held, or was to have held the same, and subject to the same conditions and payments," and also to the further payment of £460, the money so paid to be divided between all his daughters equally. He further directed that the residue of his estate, real and personal, should be sold by his executors, and the proceeds divided between Joel and the five daughters of the testator; but in case Samuel should die *before he marries*, and the estate devised to him devolve to Joel, then in that case, it was his will that Joel should not have any part of the residual estate, but that it should be divided between his daughters:

*Held*, that Samuel having died *unmarried*, after the death of the testator, the estate passed by executory devise to the heirs or devisees of *Joel;* that the testator contemplated the death of Samuel, whenever it might happen, *before marriage*, as the event on which the estate devised was limited over in fee to Joel, his heirs and assigns, and as Samuel died *before he married*, the estate by the limitation became the property of the heirs or devisees of Joel; they to take it subject to the payment of the legacies charged on it, if not paid, and to the payment of £460, to the daughters of the testator, or their representatives; and also to the payment to the same of what Joel may have received out of the residuary estate.

ERROR to the Common Pleas of *York county*.

This was an action of ejectment by Jonathan Jessup, administrator with the will annexed of Joel Willis, deceased, against Levi Smuck and Joel Fisher.

A case was stated as if found by a special verdict, and to be subject to a writ of error, without oath, recognizance, &c.

William Willis, of said York county, on the 30th day of the seventh month, A. D. 1800, made his last will and testament in writing of that date. He died in September 1801; and the said will, on the 7th day of October 1801, was duly proved and recorded in the register's office of said county, (*prout* said will hereto annexed and made part of this case.) At the date of said will, and at his decease, the said William Willis was the owner in fee simple of the land for which this suit is brought.

Letters testamentary on the said will were granted to the executors therein named, on the said 7th day of October, A. D. 1801. The said executors administered the said testator's estate, and filed their account of said administration in the register's office, on the 19th of August 1803, which was duly confirmed by the Orphans' Court of said county, December 20th, 1803, by which account there

[Jessup *v.* Smuck.]

appears a balance in favor of the estate of £608 4*s.* 8*d.* ($1622.95½,) (*prout* said account.) The several legacies in the said will mentioned, out of the personal estate, were paid soon after the settlement of the said account, and the residue was distributed and paid according to the first distribution thereof directed by the will; the testator's daughter Susanna receiving one-sixteenth part, and the testator's son Joel receiving his equal share of it, to wit, £136 19*s.* 9*d.*, ($373.18.) At the date of said will, the testator's son Samuel was twenty-two years of age, unmarried, and resided with his father. Joel, with his wife and two children, resided in North Carolina; and John resided on the property devised to him in the will.

Samuel Willis, at the death of his father, entered into possession of the land devised to him by the will, and held the same to the time of his death. He was never married, and died intestate on the 22d of January, A. D. 1848, leaving also other real estate and personal property undisposed of. The defendants claim to hold the premises as and for the heirs of the said Samuel Willis.

Samuel Willis, after taking possession of the said land, paid in money the several legacies which he was ordered by the will to pay as devisee of the same, and among others, the legacy of £50 to Joel Willis.

Joel Willis died in the State of Ohio, in January 1843. By his last will and testament, which was duly admitted to probate in this State, and letters of administration with the said will annexed, granted by the register of York county to the plaintiff in this suit, he directed as follows:

Item 3. If I should ever fall heir to a certain tract of land, lying in the State of Pennsylvania, willed to me by my father conditionally, my executors shall sell the same, either at public or private sale, and shall make a good and lawful deed to the purchaser thereof, and after the expenses are all paid, divide the purchase-money equally amongst all of my heirs, namely, Lydia Thornburg, Anna Thornburg, Ariah Hyatt, Jonathan Willis, and Jesse Willis, to them, their heirs and assigns for ever. (*Prout* the said will.)

If upon these facts the plaintiff be entitled to recover—then judgment for the plaintiff.

If the plaintiff would be bound to pay to the legatees again, or to refund to the estate of Samuel Willis, the legacies which Samuel Willis was directed to pay and did pay as devisee of said real estate, or to refund the share of the residue of the testator's estate received by Joel Willis, then judgment to be entered for the plaintiff, on condition of his payment of the sums which he would be liable to pay as aforesaid.

If the plaintiff be not entitled to recover—then judgment for defendants.

[Jessup *v.* Smuck.]

The will of William Willis, deceased, of Manchester township, York county, contained, *inter alia*, the following provisions :—

Imprimis, my will is and I do hereby order that all my just debts and funeral charges be first paid out of my estate as soon as may be conveniently done after my decease, by my executors hereinafter named.

I do give and devise to my son John Willis and to his heirs and assigns all my messuage and tracts of land situate in Newberry township and county aforesaid adjoining lands of James Bane and others and whereon my son now dwells being three several tracts of land lying contiguous and containing in the whole one hundred and twenty acres be the same more or less with all the buildings and improvements hereditaments and appurtenances to the same belonging or in any wise appertaining, to have and to hold to my said son his heirs and assigns for ever he or they paying thereout and therefor to my executors the sum of one hundred pounds lawful gold or silver coin current in Pennsylvania in manner following (viz.) twenty-five pounds thereof one year after my decease and twenty-five pounds yearly till the whole be paid and also one other hundred pounds for which I mortgaged the said land for his use, the money he shall pay to the mortgagee together with all the interest due and to become due thereon.

Item. I give and bequeath to my daughter Susanna (the wife of Samuel Fisher) the best case of drawers now in my house.

Item. I give and bequeath to my daughter Hannah (the wife of Samuel Wilson) the sum of fifty pounds like money aforesaid to be paid to her by my son Samuel Willis as shall be hereafter directed.

Item. I do give and bequeath to my son Joel Willis and to his heirs and assigns an annuity or yearly ground rent of six pounds per annum due from Peter Sandoe for a mill seat situate on a former part of my land in Manchester township aforesaid and which I had leased to a certain Stophel Slagle subject to the said ground rent of six pounds per annum. To have and to hold to him my said son Joel his heirs and assigns for ever. I also give and bequeath to him my said son the sum of fifty pounds like lawful money aforesaid to be paid to him by my son Samuel Willis as shall be hereinafter directed.

Item. I give and devise to my daughter Lydia (the wife of William Farquhar) four acres of meadow ground to be laid off for her from my land in Manchester township aforesaid beginning at a corner of Joseph Updegraff's meadow at Robert Jones's line thence running up said line so far as to make the said quantity of four acres by running a line parallel to said Joseph Updegraff's line through to Jacob Gartner's line of his meadow lot. To have and to hold the said four acres of meadow ground with the appurte-

nances to her my said daughter Lydia her heirs and assigns for ever.

Item. I do give and devise to my daughter Mary Willis and to her heirs and assigns four acres of meadow ground to be laid off for her from my land in Manchester township aforesaid, beginning at a corner of that devised to my daughter Lydia at Robert Jones's line, thence up said line so far as to make the said quantity of four acres by running a line parallel to the division line of that devised to my daughter Lydia aforesaid through to Jacob Gartner's line. To have and to hold the same with the appurtenances unto her my said daughter Mary her heirs and assigns for ever. I do also give and bequeath to her my said daughter Mary one feather bed and furniture, a bureau, one cow the choice of my stock, and seven pounds like lawful money aforesaid, exclusively of her dividend of my residual estate.

Item. I do give and devise to my son Samuel Willis and to his heirs and assigns all the residue of my dwelling messuage and tract of land situate in Manchester township aforesaid together with all and exclusively the water-right which I reserved in the before mentioned lease to Stophel Slagle and also twenty-five acres of land be the same more or less adjoining lands of Abraham Yost and others situate in York township. To have and to hold the said messuage and several tracts of land hereditaments and appurtenances to the same or either of the same belonging or in any wise appertaining to him my said son Samuel and to his heirs and assigns for ever. He or they paying thereout and therefor to my daughter Hannah Wilson or to her heirs or assigns the sum of fifty pounds like lawful money aforesaid, twenty-five pounds thereof one year after my decease and the remainder two years after, and to my son Joel Willis or to his heirs and assigns the sum of fifty pounds like lawful money aforesaid four years after my decease, and also to my daughter Betty Willis or to her heirs or assigns the sum of eighty pounds like lawful money aforesaid one year after my decease, or he shall lay off and convey to them and each of them respectively so much of my dwelling plantation as shall be worth their respective sums of money, and I do leave it to his option which he shall do, and he my said son Samuel shall also pay to my grandson James Speakman the sum of ten pounds like lawful money aforesaid six years after my decease. I also give and bequeath to my son Samuel two horse creatures the choice of all those I may be possessed of at my decease he paying or allowing to my residual estate the sum of ten pounds for each and he shall have the liberty of taking one other at the appraisement; and I also give and bequeath to him my said son a desk which stands in my dwelling house and is now called his own and one-third part of the grain which may be in the ground at my decease on my said dwelling plantation and one third of that which may have been raised the preceding year or

[Jessup *v.* Smuck.]

such part thereof as may not have been disposed of before my decease.

Item. I do give and bequeath to my daughter Betty Willis the sum of eighty pounds like lawful money aforesaid to be paid to her by my son Samuel Willis as above directed and also one feather bed and furniture one bureau and a cow the second choice of my stock and seven pounds lawful money aforesaid to be paid to her by my executors exclusively of her dividend of my residual estate.

And it is my will and I do hereby order that if either of my two daughters Mary and Betty should die before they marry such deceased child's part shall be sold and the money arising from such sale shall be divided as my residual estate, and in case my son Samuel should die before he marries, then all that part of my estate which I have devised to him in that case I give and devise to my son Joel Willis his heirs and assigns. To have and to hold to him my said son Joel his heirs and assigns for ever in as full and ample a manner as my son Samuel held or was to have held the same and subject to the same conditions and payments and he or they shall pay the further sum of four hundred and sixty pounds lawful money aforesaid and the money so paid shall be divided between all my daughters equally share and share alike. And I do hereby further order that all the residue of my estate both real and personal shall be sold by my executors and the monies arising from such sale shall be divided between my son Joel and my five daughters Susanna Hannah Lydia Mary and Betty in the following manner (viz.) Susanna shall have one-sixteenth part of the whole and the remainder shall be equally divided between my other five mentioned children. But in case my son Samuel should die before he marries and the estate which I have devised to him devolve to my son Joel, then in that case it is my will that my said son Joel shall not have any part of my residual estate but that it be divided between my aforesaid five daughters in the following manner (to wit) Susanna shall have one-thirteenth part of the whole and the remainder shall be equally divided between my other four daughters.

And lastly I do hereby appoint my son Samuel Willis and my trusty friend John Love executors of this my last will and testament and do hereby authorize and empower them to sell my tract of land situate in Conewago Mountain and all other my estate not herein otherwise disposed of and also such other part as may fall under their care by the decease of any of my children as aforesaid and deeds and conveyances make do and execute to and for the purchaser or purchasers thereof in as full and ample a manner as I myself could or might now do, and I do hereby revoke and disannul all former wills heretofore by me made and confirm this writing for and to be my last will and testament.

In witness whereof, &c.

October 2, 1850. The opinion of LEWIS, J., was as follows:—
The plaintiff claims under the will of Joel Willis, who was the son
of William Willis, deceased. The defendants 'claim as heirs of
Samuel Willis, who was also a son of William Willis, deceased.
William Willis, the common ancestor, in his will, made in 1800,
devised the land in controversy "to my son Samuel Willis, *and to
his heirs and assigns*," "to have and to hold," "to him my said
son Samuel, and *to his heirs and assigns for ever,* he or they paying
thereout and therefor" ·certain legacies specified in the will. The
testator then proceeds to make other dispositions respecting his
estate, and in a subsequent part of the will there is this provision:
"And in case my son Samuel should die before he marries, then
all that part of the estate which I have devised to him in that case
I give and devise to my son Joel Willis, his heirs and assigns, to
have and to hold to him my said son Joel, his heirs and assigns
for ever, *in as full and ample a manner as my son Samuel held or
was to have held the same, and subject to the same conditions and
payments*"—with a further charge of £460 for the daughters.

The authorities seem to concur in establishing the rule of con-
struction, that where the gift is plainly and clearly a fee simple, to
take effect immediately in possession, a devise over in case of the
death of the first-named object of the testator's bounty is to be
treated or intended to provide for his death in the lifetime of the
testator. This rule is *professedly* founded upon the necessity of
giving such a construction to a will as. shall preserve it from re-
pugnancy, and shall allow each clause a full operation. But it
may be aided by the public policy, which is averse to the continu-
ance of lands in a condition incapable of transmission by alienation
for long periods of time. The rule does not seem to be confined
to cases where death alone is mentioned without any qualification,
but has been applied to cases where the estate is directed to go
over if either of the first named devisees "should happen to die
*without child or children lawfully begotten*," 5 *B. & Ald.* 636, or
"should die *leaving child or children*," 13 *East* 359, or "should
die *without issue born alive*," 1 *Harris* 152. It would seem
also from the cases, and from the observation of Mr. Justice BELL,
in the case last cited, that this rule is applicable whether the
*corpus* of the gift be personalty or realty, where the whole *interest
in each is given,* subject to be defeated by the implied contingency,
although most of the cases present bequests of movable property:
Caldwell *v.* Skilton, *id.* 126. The qualifications which relate to
*marriage* or the *birth of children* are insufficient to take the case
out of the rule. To have this effect, some qualification must be in-
troduced which refers to the *time of the death,* and not to the *cir-
cumstances* of the *devisee* upon its occurrence.

In the case before us, it does not seem to be material whether
the testator contemplated the death of Samuel before the *accept-*

[Jessup v. Smuck.]

ance of the devise and *becoming personally bound* for the legacies to be paid "therefor;" or before final distribution of the estate, or before the death of the testator. We incline to think that the testator referred to the period when his will was to take effect, and that Samuel, not having died unmarried before the testator, took a fee simple subject to no other conditions than the payment of the legacies charged. The devise to Joel, we think, was only intended as a substitution in case of the death of Samuel unmarried *before the death of the testator*. Joel was only to take "in *as full and ample* a manner as Samuel held or was to have held, and *subject to the same conditions* and *payments*." The condition of *dying before he marries* could not be annexed to the gift to Joel, who was already married, and yet he was to hold as *Samuel held*, and *subject* to *the same conditions and payments*. From this, and all the other provisions of the will, we are of opinion that the defendants are entitled to judgment on the case stated.

Judgment for defendants.

It was assigned for error:

The judgment should have been for the plaintiff, subject, if the court considered it necessary to make such order, to the payment of the legacies charged on the premises to the estate of Samuel Willis; and of £460 to the daughters of William Willis, or their representatives; and £136 19s. 9d. to the estate of the said William Willis.

*Chapin*, for plaintiff in error and plaintiff below.—The plaintiff claims that by the will of William Willis, deceased, Samuel Willis took the fee simple of the premises *defeasible* on his death before marriage, and on the happening of this contingency, the fee simple passed by *executory devise* to Joel Willis, the plaintiff's testator.

That a fee simple may by *executory devise* be limited after a fee simple either *vested* or *contingent*, is as well established as any principle recognised in law: *Fearne on Rem.* 395-6-7, and cases there cited; 4 *Wils. Bac. Abr.* 297; 4 *Kent. Com.* 269-70; 2 *Bin.* 532, Hauer's Lessee v. Sheetz.

The defendants in the court below contended, and the court (Judge LEWIS) decided, that Samuel took at once on the testator's death *an indefeasible estate in fee simple*—in other words, that Joel was a mere substitute, to take only in case the devise to Samuel should lapse *by his death in the testator's lifetime*.

To sustain this position, it was claimed as a rule of construction, that a devise over in the event of death, where the first devisee is to take immediately, is construed to mean death *in the lifetime of the testator*.

The cases cited in support of this position were, with three exceptions, cases in which the death was connected with no other

circumstance and with·no context indicating a longer time. The words used were merely "in case of her death"—"if either should die"—"in the event of her death"—"in case of her demise"—"in case of death happening to her"—"in case of her decease," &c.

Most of these cases were also of bequests of personal property, with respect to which courts have been more reluctant to sustain executory devises. And, even in these cases, the decisions are conflicting. In Cambridge *v.* Rous, 8 *Vesey* 12, Sir WILLIAM GRANT says, "Words precisely the same were differently construed in Lord Douglass *v.* Chalmer," 2 *Vesey Jr.* 501; and Hinckly *v.* Simmons, 4 *Vesey* 160. In the former, the words were "in case of her decease" and the executory legatee took,—in the latter, the words were "in case of her death," and the first taker held. The cases on both sides are exhibited in note A to Billings *v.* Sandom, 1 *B. C. C.* 394, to all which reference is now made. Upon this rule, Mr. Jarman remarks as follows:—" But although, in case of an immediate *gift*, it is *generally true* that a *bequest* over in the event of the death of the preceding *legatee* refers to that event occurring in the lifetime of the testator, yet *this construction is made only ex necessitate rei*, from the absence of any other period to which the words can be referred, as the testator is not supposed to contemplate the event of himself surviving the objects of his bounty:" 2 *Jarman on Wills* 664–5.

But this rule, artificial at best, and confessedly not universal in its application, even when the event is *death only*, and belonging especially to personal property, is reversed *when other collateral events* are connected with the event of death. Mr. Jarman thus states it:—" It will commonly be found, it is conceived, that *where the context is silent*, the words referring to the death of the prior legatee in connection with some collateral event, apply to the contingency happening as well *after* as before the death of the testator:" 2 *Jarman on Wills*, 687; Allen *v.*'Farthing, same page; and Child *v.* Giblet, 488.

The cases above alluded to as exceptions, in which other events were connected in the will with the event of death, and yet were brought within this artificial rule, are Clayton *v.* Lowe, 7 *Eng. Com. Law* 218, in which no reason is given for the decision; in which the words are, "or should die leaving child or children," and of which Mr. Jarman says—"The reasons for the conclusion at which the court arrived do not appear." "Whether the certificate of the Court of King's Bench was confirmed by the vice-chancellor does not appear. Under such circumstances, it would be *unsafe to rely on the case as a deliberate adjudication* in support of so *doubtful a principle:*" 2 *Jarman on Wills* 692. This case is therefore too apocryphal to sustain the defendant's construction.

The next and only other English case of this class cited by defendants, is that of Doe *v.* Sparrow, 13 *East* 359. Here were

three contingencies of death, to wit: 1. "In case of the death of either my son or daughter leaving child or children." 2. "In case my said son and daughter shall be both dead at the time of my decease," then to executors and brother. 3. "In case of the death of my said son and daughter at the time before mentioned."

In construing this will, Lord ELLENBOROUGH says, "The limitations to the executors and to his brother are confined in *express terms* to the event of the death of his son and daughter *in his lifetime*, and *from thence it is inferred* that he was contemplating a death in his lifetime in the preceding clause." And further, "the express restriction to death in testator's lifetime in one clause, leads the court to infer that in the other clauses death during the same period was intended."

Of this case Mr. Jarman remarks:—"But this construction was aided by the context, particularly by a gift over of the entire property in case both devisees were dead at the time of the decease of the testator without children, from which the court inferred that in the clause in question he contemplated death at the same period." 2 *Jarman on Wills* 653. How can this case be a guide for one in which *there is no such express limitation?*

In Caldwell *v.* Skilton, 1 *Harris* 153, the only remaining case of this class cited, the decision is distinctly placed, as to the construction of the will, upon the incongruity which must result from any other construction, and the impossibility of harmonizing its provisions, or carrying into effect the obvious general intention of the testator, without fixing the time of the testator's death as the period for the death of the first taker. This case, like the two preceding, and that of Jenour *v.* Jenour, 10 *Vesey* 563, cited in support of it, was a tenancy in common to the first takers with survivorship, (a condition of things on which the court placed some reliance,) and that survivorship, if treated as unlimited in duration, might entirely defeat the obvious general intention of the testator. Hence, in this case there was a necessity of applying, as to time, that which Mr. Jarman says is "so doubtful a principle." In the case before the court there is no tenancy in common, with survivorship, nor in any conceivable contingency would the obvious general intention of the testator be frustrated by giving to the words of the will their common and ordinary interpretation.

None of the cases above cited connect marriage with the event of death.

But the time intended by the testator is in fact fixed by the very sentence which imposes the defeasance and creates the executory estate. "In case my son Samuel should die *before* he marries, *then*" I give, &c. to Joel. Should die! When? Not generally, or at any time, not in testator's lifetime, nor with or without issue, as in the cases of limitation, but "before he marries." Marriage was to render indefeasible, not death to render defeasible, the

estate given to Samuel. His non-marriage was the event which made the premises the property of Joel the first moment such non-marriage could be certain, to wit, Samuel's death. Death was never, in the mind of the testator, the contingency on which the estate was to go over, but non-marriage; and death is only named as the farthest boundary of the period for the performance of the condition which should make Samuel's title indefeasible. Time subsequent to the testator's own decease was in his mind throughout his whole will; legacies were to be paid from one to six years after his decease; the last-named time being allowed for the trifling sum of £10. The testator made all the limitations of time he chose to make even in minute matters, and it cannot be supposed that he omitted such limitations as he desired in matters of greater importance.

Non-marriage is a good condition of defeasance: 2 *Strange* 1175: "Devise to A in fee, but if he dies under age or unmarried and without issue, then over; all the events must concur to defeat the estate."

Griffith *v.* Woodward, 1 *Yeates* 316: "If either of my said sons shall happen to depart this life unmarried and without lawful issue," then survivorship. Marriage prevented executory devisee from taking. Also cited Drinkwater *v.* Combe, 2 *Sim. & Stuart* 340.

*Evans* and *Mayer* were for defendants in error.—The defendants do not admit that the will vested in Samuel Willis an estate "defeasible on his death before marriage," *at any time*. It appears to have been the primary object of the testator to provide for Samuel, and to invest him with full dominion over the most valuable part of his property, worth now perhaps $14,000 or $15,000. The case finds that Samuel was twenty-two years of age at the date of the will, was unmarried, and resided with his father. The two unmarried sisters were no doubt also at home.

That the testator contemplated some contingency upon which Joel should take the place of Samuel and become invested with the property devised to Samuel on the same terms and conditions as Samuel "was to have held it," there is no doubt. The devise to Joel is substitutionary to that to Samuel. The contingency which was to determine this substitution was the death of Samuel—*his death in the lifetime of the testator, while yet unmarried*. In that event Joel was to take the place of Samuel. An additional payment of £460 was imposed on Joel, no legacy out of the land was to be received by him, no share of the residual estate was to be paid to him, but the residual estate was to be divided into other and different shares from what was to have been the case in the event of the property vesting in Samuel.

This construction is indeed required by the established rules of law. "All the authorities concur," says Mr. Justice ROGERS, "per-

[Jessup *v.* Smuck.]

haps without exception, that, when the gift is *immediate*, that is, in possession, it is to be treated as intended to provide for the death of the objects of the testator's bounty in the lifetime of the testator; the devise affording no other point of time to which they could be referred:" Johnson *v.* Morton, 10 *Barr* 250. It is not only in case of death simply that the time of it is referred to the death of the testator. Death connected with collateral circumstances, as *without leaving children*, has been ruled to refer to the period of the testator's death: Clayton *v.* Lowe, 6 *Barn. & Ald.* 636, (7 *Eng. Com. Law Rep.* 218.) The authority of this case is faintly impugned by the plaintiff, but is fully sustained by Mr. Justice BELL in the late case of Caldwell *v.* Skilton, 1 *Harris* 152, which is also direct to the point, and shows that the rule is applied to real as well as personal estate. In the case of Montagu *v.* Nucella, 1 *Russell's Ch. Rep.* 165, decided since Clayton *v.* Lowe, there were two bequests to which the rule was applied.

Prior to any of these cases was that of Doe *v.* Sparrow, 13 *East* 359, in which death *without leaving issue* was referred to death in the lifetime of the testator. It is true that "the construction in that case *was aided* by the context," but that is no objection to it; and we think that such is the fact also in the present case: Child v. Giblet, 3 *Myl. & Keen* 71. Lippincott *v.* Warden, 14 *Ser. & R.* 115, is disposed of in Caldwell *v.* Skilton, 1 *Harris.*

We submit, therefore, that the rule is too firmly established to be shaken, that where the devise is *immediate* and *absolute*, a devise to another, in case of the death of the first-named devisee, although connected with some collateral circumstance, is substitutionary only, and refers to the death of the first devisee in the lifetime of the testator. There cannot be any difference whether the collateral circumstance be the *having issue, having children*, or the *marriage* of the first devisee. The conjunction of the circumstance with the event of the devisee's death might be thought to import a contingency in the one case as much as in the other. But the conjunction of such personal circumstances with the event of death does not, under the rule, determine the contingency which the testator contemplated; and to effectuate his intention, and not destroy the estate he has given, it becomes necessary to refer the happening of the event to the period of the testator's death.

The plaintiff, in the course of his argument, dwells on the word "*before*," in the phrase "should die *before* he marries," and seems to think the force of it decisive of the question. The emphasis however is on the word *die*, leaving the office of the word *before*, as a mere preposition, (not an adverb,) having the words *he marries* for its object, to append the collateral circumstance of marriage to the death. It will not do, however, to hinge a cause upon a single word, in opposition to the context and general intent of a will. We

may say of this word, as well as of the word *then*, referred to by the plaintiff, what Lord HARDWICKE said of the latter in Beauclerk *v.* Dormer, 2 *Atkyns* 311 : "If the court here were to lay any stress upon the word *then*, it would be going a great deal too far, for it is too ambiguous to be taken as an adverb of time;" "*then*, in a grammatical sense, is an adverb of time, but in the limitation of estates, and framing contingencies, it is a word of reference, and relates to the determination of the first limitation in the estate where the contingency arises."

The opinion of the court was delivered June 16, by

CHAMBERS, J.—William Willis, by his will, made in 1800, devised the lands in controversy to his " son Samuel, and to his ·heirs and assigns," to have and to hold " to him my said son Samuel Willis, and to his heirs and assigns for ever, he or they paying thereout and therefor certain legacies." And in a subsequent part of the will it is provided, " and *in case my said son Samuel should die before he marries, then* all that part of the estate which I have devised to him, in that case I give and devise to my son Joel Willis, his heirs and assigns, to have and to hold to him my said son Joel, his heirs and assigns for ever, in as full and ample a manner as my son Samuel held, or was to have held the same, and subject to the same conditions and payments," with a further charge of £460 to his daughters. At the date of the will, Samuel was of the age of twenty-two, unmarried, residing on the mansion farm devised, with his father, who lived about thirteen months after the making of his will. Samuel, at the death of his father, entered into the possession of the land devised, and paid the legacies charged in the will, and died in 1848 intestate, and without having been married. The plaintiffs, devisees of Joel Willis, claim the land in controversy under the limitation contained in the will of William Willis in favour of their testator, Joel Willis. This case has been prepared with great industry and research by the counsel on both sides, who have argued it with much learning and ability.

It is ever professed by courts, that the construction to be put on wills is to execute and carry out the intention of the testator, if that intention can be discovered, and does not contravene some established rule or principle of law. Artificial rules of law have been adopted from necessity, and called in to aid in giving effect to a general intent, conflicting with some particular intent in the same will, or to supply some obscurity in the full intent of the testator, and to sustain the policy of the law.

By the will of William Willis, a fee is devised in the mansion farm to his son Samuel, and the question is, when, and on what event was it made defeasible, and limited over to his son Joel, his heirs and assigns ?

[*Jessup v. Smuck.*]

The non-marriage of Samuel was an *event* that received the attention of the testator, as worthy of testamentary provision. It was not on the death alone of Samuel that the estate was limited over to Joel, as it is provided "in case my son Samuel should die before he *marries*, then all that part of my estate which I have devised to him, in that case I give and bequeath to my son Joel Willis, his heirs and assigns."

But it is death, without marriage. The limitation over is not on the contingency of his death in testator's lifetime, as averred by the defendants, nor is it on the event of his death with or without issue, as in cases of limitation—but "before he marries." If he dies before his marriage, *then*, says the testator, I devise the estate to Joel. The estate was to go over on the contingency of the death of Samuel at any time without marriage.

The property was to pass to Joel when such non-marriage could only become certain, to wit, at Samuel's death. The manifest intention of testator was, that of his children, Samuel and Joel were the only ones to have and enjoy his mansion farm as provided in his will.

The testator was providing for the disposition of his estate after his decease, and must be supposed to refer to events, and their occurrence in time subsequent to his death. That time subsequent to his decease was alone in the contemplation of testator is to be inferred from the payment of the legacies charged, which were to extend from one to six years after his decease; and where he imposed limitations of time as to payments and minute matters, we are not to suppose that the occurrence of the marriage of Samuel, which he would seem to have regarded with interest, was not to apply to the devise to Samuel after the death of the testator.

. The provisions and terms of this will are strong to show that the testator contemplated and provided for the death of Samuel, without marriage, at any period of his life, as the time and event on which the property in controversy was to pass over to Joel.

It is contended, on the part of the defendants, that Samuel took an indefeasible estate in fee simple on his father's death, subject only to payment of legacies, with no other limitation; that Joel, by the will, was to take only in case the devise to Samuel should lapse by his death *in the lifetime of their father.* To sustain this construction, it was alleged that, by a rule of construction established by authority, a devise over in the event of death, when the first devisee is to take immediately, is construed to mean death *in the lifetime of the testator,* and that the rule is not confined to cases where death alone is mentioned *without any qualification,* but has been applied to cases where the estate is directed to go over if either of the first devisees "*should happen to die without child or children lawfully begotten:*" Clayton *v.* Lowe, 5 *Barn. &*

*Ald.* 636; or should die without *leaving child or children :* Doe *v.* Sparrow, 13 *East* 359 ; or *should die without issue born alive,* Caldwell *v.* Skilton, 1 *Harris* 152.

Mr. Powell, in the 37th chapter of his treatise on Devises, after reviewing some of the leading cases in relation to the artificial rule, says—"But in cases of *immediate* gifts, it is generally true that a bequest over, in the event of the death of the preceding legatee, refers to that event occurring in the lifetime of the testator; yet this construction is only made *ex necessitate rei*, from the absence of any other period to which the words may be referred, as a testator is not supposed to contemplate the event of himself surviving the objects of his bounty :" 2 *Pow. Dev.* 763–65.

This rule, admitted to be artificial, is not of uniform application where other collateral events are connected with the death. The case of Lippincott *v.* Warder, 14 *Ser. & R.* 115, is in conflict with the rule of construction insisted on, and is to be respected from the consideration given to it and exhibited by the learned judge who delivered the opinion. Mr. Jarman states, "It will commonly be found, it is conceived, that where the *context is silent,* the words referring to the death of the prior legatee in connection with some collateral event, apply to the contingency happening as well *after* as before the death of the testator :" 2 *Jarman on Wills* 687. The case of Clayton *v.* Lowe was not a case of such deliberate adjudication as to be relied on; and in the case of Doe *v.* Sparrow, 13 *East* 359, Lord ELLENBOROUGH, in construing the will, says, "the limitations to the executors and to his brother are confined in *express terms* to the event of the death of his son and daughter in *his lifetime ;* and from thence it is inferred that he was contemplating a death in his lifetime in the preceding clause."

In Caldwell *v.* Skilton, 1 *Harris* 153, the decision is distinctly placed, as to the construction of the will, on the evidence of intent, to be inferred from its context, being in conformity to the rule referred to; and to avoid the incongruity which must result from any other construction, in carrying out the provisions of the will and the general intention of the testator. The case last referred to as made by this court, was a tenancy in common to the first takers with survivorship, a circumstance that had its influence on the opinion of the court. The opinion of the court, as delivered by Justice BELL, in Caldwell *v.* Skilton, has our entire approbation. In the case of Johnson *v.* Morton, 10 *Barr* 245, referred to, words giving an estate of inheritance before the act of 1833, were held from the context to pass a fee ; and the artificial limitation of the time of death, was recognised, as applying in that case, where there was a devise to several daughters or the survivor of them ; and Justice ROGERS, whilst he applied the rule in aid of the intention of the testator to provide for a death in his lifetime,

[Jessup *v.* Smuck.]

says, "the devise affording no other point of time to which they could be referred."

In this case now under consideration, there is no tenancy in common with survivorship; nor in the contingency contemplated, of the limitation over to Joel on the death of Samuel at any time before marriage, would the obvious general intention of the testator be frustrated by giving to the words of the will their common and ordinary interpretation.

It is to be remarked, that none of the cases referred to and relied on for the defendants, connect marriage with the event of death. Non-marriage is a good condition of defeasance : 2 *Strange* 1175; and in Griffith *v.* Woodward, 1 *Yeates* 316, it was by the will provided, "if either of my said sons shall happen to depart this life unmarried, and without lawful issue, then" the survivor was to enjoy all: it was held that marriage prevented the executory devisee from taking. In the last case, the court say that the testator "probably intended to tempt his sons to marry, and therefore subjected their lands to that condition." If the testator in this case be considered as holding out an inducement to his son Samuel to marry, by making the estate devised to him absolute on marriage, it must be intended as referring to a marriage not during the short time of the testator's nearly spent life, but to a time after his death, when Samuel became acquainted with the devise to him of the mansion farm in fee, but with a limitation over to his brother Joel and his heirs in case Samuel should die before he marries.

In the cases which limit the death to the testator's lifetime, it is admitted that it is adopted from necessity, in aid of what was considered the general intent of the testator, and was not applied where the first taker is referred to or treated as living at a period subsequent to the death of the testator. That the testator did not contemplate the death of his son Samuel to occur before his own, is, as we have observed, to be inferred from the terms used to express the contingency and the limitation ; but is also confirmed by other dispositions in the will in relation to Samuel, which have reference to a time subsequent to testator's death. The will devises to Samuel the grain which is growing on the ground *at testator's decease*, allows him to take at low prices, *after testator's decease*, stock which testator shall have left, and other stock at the appraisement; gives him the *option* and the right to give land to his sisters in lieu of pecuniary legacies, payable *one, two,* and *four* years after testator's decease. These and other provisions, to be executed by Samuel after testator's decease, are to be regarded in confirmation of the construction we have adopted to effectuate the intention of the testator in limiting the estate over to Joel on the death of Samuel after the testator's decease, in case Samuel should *die before he marries.* Samuel having died unmarried, the estate passed by executory devise to the heirs or devisees of Joel

[Jessup *v.* Smuck.]

Willis.    There is no rule of law contravened by this limitation. That a fee simple may by *executory devise* be limited after a fee simple vested or contingent, is well established: *Fearne on Rem.* 395–6–7 ; 2 *Bin.* 532, Hauer's Lessee *v.* Sheetz.

The limitation over is not on an event too remote, but, being to occur within a life in being, is good as an executory devise, as is well settled.    However sound public policy may be against locking up estates from alienation or disposition, and protracting the acquisition of the absolute interest in or dominion over property, yet any change of the law on this subject is to be made by legislative provision, and not by the judiciary, who are not to indulge in judicial legislation, but as expounders of the established law are bound to maintain it and the line which divides judicial from legislative functions.    Where there exist provisions in the will evidencing a particular intent, and directory in small matters in the distribution of the estate or fund, they must be made to yield and conform to the general intent as manifested and to be executed, and with which they may appear to conflict.    The representatives of Joel are to take the estate in fee, and to hold the same in as full and ample a manner as Samuel held or was to have held the same, and subject to the same conditions and payments ; and they are to pay the further sum of £460, to be divided amongst testator's daughters or their representatives, as well as refund and pay to the representatives of the estate of William Willis, the testator, what Joel or his representatives may have received out of the residuary estate of the testator.    Some of the provisions that were personal in their application to Samuel, and not to Joel, cannot apply to Joel or his heirs or devisees, who from necessity must take the said estate discharged from such conditions as were applicable only to Samuel as dying before he marries, which could not be annexed to the devise to Joel, who was married, and from paying over to legatees legacies already paid by Samuel in his lifetime.    Such provisions, being not applicable to Joel or his representatives, are to be rejected as immaterial and inoperative at this time, to effectuate the manifest general intent of the testator in limiting his estate to his sons Samuel and Joel.

It is the opinion of the court on the will of William Willis, that the testator contemplated the death of his son Samuel, *whenever it might happen* before marriage, as the event on which the estate devised was limited over in fee to Joel, his heirs and assigns ; and as Samuel did die before he married, the estate, by the limitation, became the property of the heirs or devisees of Joel.    Under this opinion, the judgment of the court below on the special verdict is reversed, and judgment entered for the plaintiffs—subject to the payment of the legacies charged on the premises, if not paid, and subject to the payment of four hundred and sixty pounds to the daughters of William Willis or their representatives, and to the

·payment to the same, in the manner provided in the will, of what Joel may have received out of the residuary estate, being, as stated, the sum of one hundred and thirty-six pounds, nineteen shillings and nine pence.